**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| CAROLE STAGNARO, and | CIVIL ACTION |
|---|---|
| DOUG STAGNARO, | |
| Plaintiffs, | |
| v. | |
| TARGET CORPORATION, | NO. 16-3535 |
| Defendant. | |

DuBois, J.                                                                          April 30, 2019

# M E M O R A N D U M

## I.    INTRODUCTION

This action arises out of a slip and fall that occurred while plaintiffs, Carole and Doug Stagnaro, were shopping at a Target store on March 13, 2016, in Malvern, Pennsylvania. Plaintiffs allege that a dangerous condition in the boys' swimwear section of the store caused Mrs. Stagnaro to fall, fracturing her hip. Presently before the Court are defendant Target Corporation's motions to preclude the testimony and opinions of Dr. Norman I. Badler and Kenneth J. Stoyack (Document Nos. 35, 36 & 46, filed May 18, 2018), plaintiffs' motions to preclude the trial testimony of Lawrence Dinoff and Dr. Ruhi Arslanoglu (Document Nos. 37 & 38, filed May 18, 2018), and the Motion for Summary Judgment of Target Corporation (Document No. 39, filed May 18, 2018).

For the reasons that follow, (1) defendant's motion to preclude the testimony and opinions of Dr. Badler is granted; (2) defendant's motion to preclude the testimony and opinions of Mr. Stoyack is granted; (4) plaintiffs' motion to preclude the testimony of Dr. Arslanoglu is granted; (3) plaintiffs' motion to preclude the testimony of Mr. Dinoff is granted; and (5) defendant's motion for summary judgment is granted.

## II.     BACKGROUND

On March 13, 2016, plaintiffs, Carole and Doug Stagnaro, visited a Target store located at 455 Carnegie Boulevard, Malvern, Pennsylvania.  Mot. Summ. J. 1.  Mr. and Mrs. Stagnaro entered the store shortly after it opened for the day and went to the boys' swimwear section.  C. Stagnaro Dep. 30:22–32:3.  Mrs. Stagnaro testified that a little after 8:30 a.m., as she was walking around the corner of a clothing rack searching for her desired merchandise, she felt her right foot catch on something, causing her to fall.  *Id.* at 31:6–25, 55:12–56:3.  Both parties agree that Mrs. Stagnaro sustained serious injuries as a result of her fall.  The parties disagree, however, as to how Mrs. Stagnaro fell and what caused her fall.

On the day of the incident, between 7:00 a.m. and 7:30 a.m., Emily Johnson, the Store Team Leader at the Malvern Target store, walked through the boys' swimwear section.  She testified that she did not notice any issues with the placement of the racks or clothing on the floor.  Mot. Summ. J. 10.  Another Target Team Member, Katherine Dokas, testified that shortly before the incident, she repositioned the rack involved in Mrs. Stagnaro's fall so that a shopping cart could pass between the structural pole and the rack.[1]  *Id.*

In her deposition testimony Mrs. Stagnaro explained that she and her husband stopped at Target that morning to purchase a boys' swim shirt.  C. Stagnaro Dep. 30:22–25.  Mrs. Stagnaro had seen swim shirts in the boys' section of the Target store on a prior occasion and, upon arrival, immediately walked to that section of the store.  *Id.* at 31:18–21.  As she approached the clothing rack she was looking for, she did not notice anything unusual about the rack or see anything on the floor below the rack.  *Id.* at 42:15–16, 45:20–21.  The rack was aligned with the edge of the aisle.  *Id.* at 54:23.  One side of the rack was near a structural pole extending from the

---

[1] According to the expert report of Kenneth Stoyack a shopping cart has a "minimum dimension of at least 27 inches." Defs. Mot. Preclude Stoyack Ex. F at 3.

floor to the ceiling. *Id.* at 53:9–10. Mrs. Stagnaro initially approached the side of the rack across from the structural pole. After browsing on that side of the rack, she walked around the rack to take a look at the swim shirts on the opposite side. *Id.* at 55:3–9. It was at that point that Mrs. Stagnaro fell.

Mrs. Stagnaro described her fall saying, "As I walked around . . . I felt like my foot was . . . caught in a trap is how I would describe it. I couldn't lift my foot up. Before I knew it, it was instantaneous and I was down. I fell." *Id.* at 55:12–18. Mrs. Stagnaro emphasized that she did not know what she tripped on. "I don't know what it was because it was something on the floor like a piece of clothing or something on the floor that when I stepped into it, whether I – I don't know. I just couldn't lift my foot. Something must have been on the floor." *Id.* at 59:23–60:4. Mrs. Stagnaro clarified that although she did not know what caused her fall, she did not believe she had tripped over the legs of the clothing rack or the pole. "[I]t was not this pole. It was not these legs. There was something there that caught my foot." *Id.* at 61:16–19. "I think it was something that had fallen. Something was on the floor. It wasn't my clothing. I didn't drop my coat. It wasn't me. That's all I can recall. Is that my foot was – it just wouldn't lift up. It was not – I definitely know it's not those legs on that." *Id.* at 61:21–62:3. When asked how she knew that she did not trip over the rack itself she said "I would have felt that metal . . . I would have felt my foot twisting on something and it wasn't that. It didn't get caught underneath the rack. . . ." *Id.* at 62:6–10.

Mrs. Stagnaro fell on her right side. D. Stagnaro Dep. 19:5–6. The impact of the fall broke her hip. C. Stagnaro Dep. at 68:18–20. After her fall, she was able to sit up and was moved to a chair to await emergency medical personnel. D. Stagnaro Dep. 22:18–23:3. Target

employees called an ambulance which took Mrs. Stagnaro to the hospital.  C. Stagnaro Dep. at 66:6–13.

Mr. Stagnaro, Mrs. Stagnaro's husband, testified that he was walking approximately three feet behind his wife at the time she fell.  D. Stagnaro Dep. 14:6–21.  As he moved toward the boys clothing section with his wife, Mr. Stagnaro noticed that the clothing rack they approached was "really close to the pole."  *Id.* at 15:11.  "So to walk between the rack and the pole, you almost would - - you would have, if you continued to walk, your right leg would have been brushing against the clothes . . . your left shoulder would have been brushing against the pole."  *Id.* at 15:11–18.  Aside from that, Mr. Stagnaro testified that he did not see any problems with the clothing rack and did not see anything on the ground underneath or around the rack.  *Id.* at 15:1–6, 18:17–22.  When his wife began to fall, Mr. Stagnaro tried to reach out and catch her but was unable to break her fall.  *Id.* at 19:2–5.  "As soon as she went down, I looked and . . . there was a boy's bathing suit wrapped around her [right] foot, that I only assume had fallen off - - it was still on the hanger as I remember, but it was on the floor."  *Id.* at 20:6–13.  Mr. Stagnaro explains the cause of Mrs. Stagnaro's fall saying "when her foot hit the bathing suit, the bathing suit never really moved, which caused her to just like she said, she felt like her foot was in a trap . . ."  *Id.* at 20:24–21:3.  Mr. Stagnaro testified that immediately after his wife's fall he removed the swimsuit from her foot and hung it back on the rack.  *Id.* at 21:4–7.

After Mrs. Stagnaro's fall, Mr. Stagnaro filled out and signed an incident report with Target Team Leader, Ms. Johnson.  The incident report stated "Guest was walking in boys. There was a bathing suit hanging off of a rack and the racks were close together.  Slipped on bathing suit.  Foot got caught in bathing suit."  Def.'s Mot. Preclude Badler Ex. B.  The incident report included details about the location of the fall, the injury, Mrs. Stagnaro's footwear, and

states that Mrs. Stagnaro "tripped on" a boys' Minion[2] bathing suit that was "hanging off [the] rack." *Id.*

Mr. and Mrs. Stagnaro filed a Complaint in the Court of Common Pleas of Philadelphia County on June 7, 2016 in which they alleged that "due to a dangerous condition [Mrs. Stagnaro] slipped and/or tripped and fell at/or near the boy's department causing her to suffer serious and permanent injuries." Compl. ¶ 6. The Complaint asserted claims of negligence (Count I), loss of consortium (Count II), and negligent infliction of emotional distress (Count III). Defendant removed the case to this Court on June 28, 2016 (Document No. 1). Plaintiffs filed an Amended Complaint on July 18, 2016 (Document No. 6) asserting the same three claims as the original complaint. On September 29, 2016, the Court dismissed plaintiffs' claim of negligent infliction of emotional distress (Count III). On May 18, 2018, defendant filed a motion for summary judgment and motions to preclude the testimony of plaintiffs' experts, Dr. Norman I. Badler and Kenneth J. Stoyack (Document Nos. 35, 36, 39). That same day, plaintiffs filed motions to preclude the testimony of defendant's experts, Lawrence Dinoff and Dr. Ruhi Arslanoglu (Document Nos. 37, 38). Each of these motions is fully briefed and ripe for decision.

## III. LEGAL STANDARD

### A. *Daubert* Motions

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[2] Minions are fictional animated creatures that were first popularized in the 2010 film *Despicable Me*. *Despicable Me* (Illumination Entertainment 2010). In the *Despicable Me* franchise, Minions act as small, yellow, oddly-shaped henchmen with a unique language all their own. *Id.*

That rule requires the Court to act as a gatekeeper and is applicable to scientific testimony and testimony based on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). A court must determine whether an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Rule 702 has a "liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). As such, the "rejection of expert testimony is the exception and not the rule." *Dorman Prods. v. PACCAR, Inc.*, 201 F. Supp. 3d 663, 686 (E.D. Pa 2016) (quoting Fed. R. Evid. 702 Advisory Committee Note).

Courts must address a "trilogy of restrictions" before permitting the admission of expert testimony: qualification, reliability and fit. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The party offering the expert must establish each requirement by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999).

        1.    <u>Qualification</u>

"To qualify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. *See Waldorf*, 142 F.3d at 625. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or

education' [] qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 855 (3d Cir. 1990) [hereinafter "*Paoli I*"] (quoting Fed. R. Evid. 702).

Moreover, "[t]his liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." *Pineda*, 520 F.3d at 244. Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996).

2. Reliability

The reliability requirement "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) [hereinafter "*Paoli II*"] (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, (1993)). The test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141–42 (emphasis omitted). In determining whether the reliability requirement is met, courts examine the following factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing *Paoli II*, 35 F.3d at 742 n.8). These factors are "neither exhaustive nor applicable in every case." *Kannankeril*, 128 F.3d at 806–07.

Under the reliability prong, parties "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Paoli II*, 35 F.3d at 744 (emphasis omitted). "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

3.     Fit

For expert testimony to meet the "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citations omitted). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

**B.     Summary Judgment**

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a mere "scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* at 252. In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (internal citations omitted). The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## IV. DISCUSSION

The rulings of the Court on the admissibility of expert testimony focus on the evidence that supports plaintiffs' claims. Thus, the parties' motions to preclude expert testimony must be addressed prior to ruling on defendant's Motion for Summary Judgment. The Court discusses each of the four *Daubert* motions below.

### A. Defendant's *Daubert* Motions

#### 1. Dr. Norman I. Badler

Plaintiffs offer Dr. Badler's expert testimony as evidence of what caused Mrs. Stagnaro's fall.[3] Defendant objects to Dr. Badler's testimony, arguing that (1) Dr. Badler is not qualified to offer an expert opinion because he does not have a professional engineering degree or sufficient engineering experience, (2) his opinions are unreliable because they are speculative and based on flawed analysis and investigation, and (3) his testimony does not fit the facts of the case because

---

[3] Plaintiffs submitted two expert reports prepared by Dr. Badler: an initial undated report and an addendum report dated February 20, 2018. *See generally* Defs. Mot. Preclude Badler Exs. F & G.

his conclusion is contrary to Mrs. Stagnaro's deposition testimony as to how she fell. *See generally* Def.'s Mot. Preclude Badler.

### a. Qualification

As an initial matter, the Court concludes that Dr. Badler is sufficiently qualified to offer an expert opinion. "To qualify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." *Betterbox Commc'ns Ltd.*, 300 F.3d at 335 (quoting *Waldorf*, 142 F.3d at 625).

Dr. Badler is a professor in the Department of Computer and Information Science at the University of Pennsylvania. Pls.' Resp. Mot. Preclude Badler Ex. H. He created an ergonomic assessment and virtual human prototyping system called "Jack." Pls.' Resp. Mot. Preclude Badler 20. This system is widely used to simulate human movement. *Id.* He has published numerous articles and book chapters on the topic of computer human models and inverse kinematics. *Id.* at 6. Overall, Dr. Badler has extensive experience in simulating human movement. Although he is not an engineer, Dr. Badler's experience sufficiently qualifies him as an expert for the purpose of reconstructing the events that caused Mrs. Stagnaro to fall. *See Waldorf*, 142 F.3d at 625 (instructing courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert). Notwithstanding his expertise, Dr. Badler's opinions must also meet the requirements of reliability and fit. *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

### b. Reliability

The reliability requirement "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli II*, 35 F.3d at 742

(quoting *Daubert*, 509 U.S. at 590). "An expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) (finding an expert's opinion that inadequate textured stripping in a bathtub caused a plaintiff's fall inadmissible "because the expert's conclusion [was] based on pure speculation, rather than a reasonable inference . . . when no evidence in the record indicates where [plaintiff] was standing in the tub"); *see also Butts v. Weisz*, No. 07-1657, 2010 WL 703238, at *7 (W.D. Pa. Feb. 25, 2010), *aff'd*, 410 F. App'x 470 (3d Cir. 2010) (excluding testimony of an expert as to causation and granting summary judgment where "the expert would have to speculate to render an opinion with respect to causation").

In this case, Dr. Badler concludes that Mrs. Stagnaro's fall and subsequent injuries were caused by the clothing rack being positioned too closely to a structural pole. He opined:

> This inadequate clearance required Carole Stagnaro to squeeze sideways along the [] rack, and as she turned counterclockwise to go around to the other side of the rack her right foot caught under the rack wheel supporting bar closest to the racetrack aisle . . . . Since this right foot lift required a knee flexion of her unsupporting right leg, she was immediately off balance and she fell to her right and backward onto her right hip and right elbow. During that fall her right leg or clothing propelled the [tile] aisle end of the rack away from the pole . . . . She was found on the carpet between the skewed rack and the pole, with her feet oriented toward the [tile] aisle.

Defs. Mot. Preclude Badler Ex. G 1-2. Dr. Badler states that his opinions are based on the deposition testimony, Target incident reports, photos taken immediately after Mrs. Stagnaro's fall, site inspections of the Target store at which the accident occurred, and the expert report of another of plaintiffs' experts, Kenneth Stoyack. *See generally* Defs. Mot. Preclude Badler Exs. F & G. Dr. Badler's opinions, however, are impermissibly speculative.

First, Dr. Badler engages in a series of unsupported assumptions in order to reach his conclusion as to how Mrs. Stagnaro fell. These assumptions include: (1) the distance between

the rack and the structural pole was 15 to 17.5 inches at the time of Mrs. Stagnaro's fall,[4] (2) Mrs. Stagnaro's feet were pointed in toward the rack in the moments leading up to her fall,[5] (3) Mrs. Stagnaro was walking sideways along the rack as opposed to walking straight forward,[6] (4) immediately before falling, Mrs. Stagnaro moved in toward the rack, after passing the structural pole,[7] and (5) that the Minion swimsuit described by Mr. Stagnaro did not independently cause her fall. All of these assumptions, critical to Dr. Badler's theory of causation, are unsupported by the deposition testimony of Mr. and Mrs. Stagnaro or any other evidence.

In fact, Dr. Badler's conclusion that Mrs. Stagnaro's foot was trapped beneath the rack's support bar is specifically denied by Mrs. Stagnaro. She testified explicitly that she did not trip over the rack itself, saying "[she] would have felt that metal. [She] would have felt . . . [her] foot twisting on something and it wasn't that. It didn't get caught underneath the rack. . . ." *Id.* at 62:6–10. Instead, both Mr. and Mrs. Stagnaro testified that she tripped on something on the floor. Mrs. Stagnaro said "I think it was something that had fallen. Something was on the floor. It wasn't my clothing. I didn't drop my coat. It wasn't me. That's all I can recall. Is that my foot was – it just wouldn't lift up. It was not – I definitely know it's not those legs on that." *Id.* at 61:21–62:3.

Similarly, Mr. Stagnaro testified that immediately after his wife's fall he noticed a boy's swimsuit wrapped around her right foot. "As soon as she went down, I looked and . . . there was

---

[4] This assumption is based on a reconstruction described more fully in Mr. Stoyack's expert report. Both Dr. Badler and Mr. Stoyack rely on this assumption in reaching their conclusions. The Court addresses this conclusion *infra* in section IV(A)(2).

[5] In her deposition, Mrs. Stagnaro was asked whether her feet were pointed toward the aisle or turned in toward the rack in the moments before she fell. She stated " I don't know. . . . I don't know where my feet were to be honest, I don't know." C. Stagnaro Dep. 57:1–10.

[6] Mrs. Stagnaro describes walking as she fell but does not state that she was walking sideways along the rack. *See* C. Stagnaro Dep. 56:10–17:10.

[7] Mrs. Stagnaro does not describe approaching the rack to inspect the merchandise more closely after turning a corner, immediately before her fall. Instead, she merely describes walking around the rack in an unspecified manner, looking for a particular color swim shirt. *See* C. Stagnaro Dep. 54:3–57:10.

a boy's bathing suit wrapped around her [right] foot, that I only assume had fallen off. . ." *Id.* at 20:6–13. Furthermore, Mr. Stagnaro explains the cause of Mrs. Stagnaro's fall saying "when her foot hit the bathing suit, the bathing suit never really moved, which caused her to [feel] like her foot was in a trap . . ." *Id.* at 20:24–21:3.

Mrs. Stagnaro testified that she does not know what caused her to fall. With that testimony Dr. Badler may not speculate as to the cause of her fall and present unsupported theories of causation to the jury. *Butts*, 2010 WL 703238 at *7. His testimony also contradicts the deposition testimony of the only witness to the fall, Mr. Stagnaro. In short, Dr. Badler's speculative conclusion is not reliable because it is not grounded in the facts of this case. *Fedorczyk*, 82 F.3d at 75. Dr. Badler is not permitted to present guesswork or mere possibilities to the jury in the form of expert opinions as to the cause of Mrs. Stagnaro's fall.[8] For those reasons, defendant's motion to preclude the testimony of Dr. Badler is granted.

### 2. Kenneth J. Stoyack

Mr. Stoyack is an architect who was retained by plaintiffs to provide an expert opinion regarding applicable building codes and industry standard. Defendants do not challenge Mr. Stoyack's expert qualifications in their motion and only advance arguments regarding reliability and fit. *See* Def.'s Mot. Preclude Stoyack 4 n. 3. Therefore, the Court addresses only Mr. Stoyack's reliability and fit in this Memorandum.

#### a. Reliability

As discussed above, an expert's conclusions must be based on "'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Paoli II*, F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). For experts on non-scientific matters, the reliability

---

[8] Because Dr. Badler's expert opinion fails to meet the reliability requirement and, therefore, is inadmissible under Rule 702, the Court need not address "fit."

determination focuses on the expert's personal knowledge and experience. In such cases, "the methodology used will be applying that experience to the facts of the case." *Flanders v. Dzugan*, No. 12-1481, 2015 WL 4507560, at *3 (W.D. Pa. July 24, 2015).

Mr. Stoyack offers three main conclusions in his expert reports.[9] First, he concludes that the distance between the rack and the structural pole at the time of the incident was 15 to 17.5 inches. Def.'s Mot. Preclude Stoyack Ex. G 5. Next, he concludes that the "recommended minimum distance between clothing racks is 30 inches." *Id.* Finally, Mr. Stoyack concludes that Target violated industry standard, National Safety Council Standards, and the applicable building code by failing to maintain safe and proper clearance between the clothing and the display. *Id.*

As an initial matter, the Court addresses Mr. Stoyack's conclusion that the rack was 15 to 17.5 inches from the structural pole at the time of the accident. Def.'s Mot. Preclude Stoyack Ex. G 2. In his addendum report, Mr. Stoyack describes the process through which he and Dr. Badler reached this conclusion. *Id.* First, they placed a clothing rack, of the same size and type involved in Mrs. Stagnaro's incident, near the structural pole. *Id.* They then used a photograph taken by a target employee immediately after Mrs. Stagnaro was taken to the hospital in order to recreate the placement of the rack as the rack appeared *after* Mrs. Stagnaro's fall. They did this by "utilizing the joint lines of the vinyl tile floor of the [] [aisle] and the pattern lines of the carpet tiles." *Id.* Next, in order to mimic the placement of the rack *before* Mrs. Stagnaro's fall, they "us[ed] the rear right wheel as a pivot point" and rotated the display rack until it was perpendicular to the vinyl tile floor of the [] aisle. *Id.* After moving the rack accordingly, Mr. Stoyack measured a distance of 17.5 inches from the clothing on the upper part of the rack's display to the building support column and a distance of 15 inches from the clothing on the lower

[9] Mr. Stoyack submitted two expert reports, an initial report dated July 21, 2017, and a supplemental report dated February 21, 2018. *See* Def.'s Mot. Preclude Stoyack Exs. F & G.

part of the rack's display to the column. *Id.* at 2-3. He concluded that these measurements accurately portray the distance between the rack and the support column at the time of Mrs. Stagnaro's fall. *Id.*

Mr. Stoyack's measurements are based on one major assumption – that the rack pivoted on its right rear wheel at the time of Mrs. Stagnaro's fall. *Id.* at 2. There is no evidence of that fact and Mr. Stoyack's report fails to justify this assumption. As defense rebuttal expert Mr. Dinoff states in his report:

> That makes no sense. The display rests on four legs all of which have non-locking casters. Physics dictates that unrestrained objects when disturbed near an end will rotate about their center of mass. Therefore, pushing one corner of the display would cause it to rotate about its center, not about a single caster.

Pls. Mot. Preclude Ex. Q 8. Mr. Stoyack's critical assumption is based on little more than speculation as to how Mrs. Stagnaro fell, how she may have hit the rack, and how the rack may have moved as a result of that impact. This testimony is thus speculative and unreliable. For those reasons the Court precludes Mr. Stoyack from testifying that the rack was 15 to 17.5 inches away from the structural pole at the time Mrs. Stagnaro fell.

Mr. Stoyack's second conclusion is that the minimum recommended distance between the rack and the structural column is 30 inches. He supports this conclusion by citing to the International Building Code ("IBC") 2009 edition – the building code in effect at the time the Malvern Target store was designed and constructed.

The relevant code provision states:

> An aisle access way shall be provided on at least one side of each element within the merchandise pad. The minimum clear width for an aisle access way not required to be accessible shall be 30 inches []. The required clear width of the aisle access way shall be measured perpendicular to the elements and merchandise within the merchandise pad. The 30-inch [] minimum clear width shall be maintained to provide a path to an adjacent aisle or aisle accessway.

Def.'s Mot. Preclude Stoyack 4 (quoting Chapter 10 of the 2006 International Business Code IBC Section 1014.4.2). He further supports his conclusion that 30 inches is the minimum recommended distance by pointing out that a shopping cart has a minimum dimension of 27 inches. "The 30 inch distance requirement and the 27 inch shopping cart width are not mere coincidences. The code required 30 inches will provide sufficient and safe distance for passage." Def.'s Mot. Preclude Stoyack Ex. F 3.

Defendant argues that Mr. Stoyack's interpretation of the IBC ignores the plain meaning of the IBC provision which states that an "aisle access way shall be provided on *at least one side* of each element within the merchandise pad." Def.'s Mem. Supp. Mot. Preclude Stoyack 7 (emphasis added). Defendant argues that because three sides of the clothing rack already had "30-plus inched accessways" the rack in question was in full compliance with the plain language of the IBC. *Id.*

Courts routinely receive expert opinion evidence with respect to building code application and interpretation by those with appropriate qualifications and experience in the field. *See, e.g., Flanders v. Dzugan*, No. 12-1481, 2015 WL 4507560, at *6 (W.D. Pa. July 24, 2015). Therefore, although defendant disagrees with Mr. Stoyack's interpretation of the code, this Court will not rule it out of the case based on defendant's reliability arguments.

Mr. Stoyack similarly offers evidence of industry standards by making reference to a National Safety Council document "identifying the principal causes of 'Falls on Floors.'" Def.'s Mot. Preclude Stoyack Ex. F 4-5. Defendant argues that this document is irrelevant because it makes no reference to spacing requirements between building elements such as racks, poles or walls. Def.'s Mot. Preclude Stoyack 8. Instead the document is focused on providing broad guidelines as to the general causes of slip and fall accidents. *Id.* Mr. Stoyack connects the

National Safety Council guidelines to the present case through two lines in the document, "The primary causes of slips and falls on floors are: . . . [i]nadequate housekeeping and maintenance[, and] [u]nsafe physical conditions created by improper work procedures." Def.'s Mot. Preclude Stoyack Ex. F 4-5. Mr. Stoyack argues that placing a wheeled clothing rack too close to a pole is an example of inadequate housekeeping and improper work procedure. *Id.* Based on this logic, Mr. Stoyack concludes that the "failure to maintain [a] safe distance between the display rack and building column was improper and inadequate housekeeping and this was not in conformance with National Safety Council standards." *Id.* at 7.

"Where the expert cites *only* to guidelines or generalized safety recommendations, what is missing is reference to actual practice in the industry through examples gained from research or [] experience." *Mendler v. Aztec Motel Corp.*, No. 09-2136, 2011 WL 6132188, at *4 (D.N.J. Dec. 7, 2011) (emphasis added). The National Safety Council guideline referenced by Mr. Stoyack, standing alone, would be insufficient evidence of industry standard. However, taken together with his references to the International Building Code, Mr. Stoyack's opinions are based on more than mere "subjective belief." *Id.* Based on this analysis the Court concludes such evidence is not unreliable.

### b. Fit

This Court has already ruled that Mr. Stoyack's first conclusion regarding the distance between the rack and support pole fails to meet the reliability requirement of Rule 702. Such testimony is therefore inadmissible. However, the Court still must determine whether Mr. Stoyack's conclusions regarding industry standards based on the IBC and the National Safety Council guidelines meet the "fit" requirement.

For expert testimony to meet the "fit" requirement, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Fit "goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal citations omitted).

Mr. Stoyack's opinions are not relevant to the Court's determination in this case based on plaintiffs' failure to provide evidence of causation. In order to succeed on their claim for negligence plaintiffs must demonstrate that (1) Target had a duty; (2) Target breached that duty; (3) there was a causal connection between the breach of duty and the resulting injury; and (4) there was actual loss or damage. *Daniel v. Sears and Sears Roebucks & Co.*, No. 15-4821, 2016 WL 521205, at *2 (E.D. Pa. Feb. 10, 2016). Each of these four elements must be supported by evidence for plaintiffs' claims to proceed past summary judgment. In this Memorandum, for the reasons discussed *infra* in Section IV(C), the Court concludes that defendant's motion for summary judgment must be granted due to a lack of causation evidence. Specifically, plaintiffs fail to provide any admissible evidence linking the alleged dangerous condition – the proximity of the rack to the structural pole – to how Mrs. Stagnaro fell. Because the Court has concluded that there is insufficient evidence of causation to sustain plaintiffs' negligence claim, no material questions of fact remain, and the Court must grant defendant's motion for summary judgment. Consequently, Mr. Stoyack's opinions are irrelevant and fail to meet Rule 702's "fit" requirement.

For the foregoing reasons, that part of defendant's motion seeking to preclude the testimony of Mr. Stoyack is granted.

**B.**     **Plaintiffs' *Daubert* Motions**

    1.    <u>Dr. Ruhi Arslanoglu</u>

Dr. Arslanoglu is an engineer with a PhD in Biomedical Engineering and a Master of Science in Engineering from the University of Texas. Dr. Arslanoglu's testimony is offered to rebut plaintiffs' expert witness, Dr. Badler. Dr. Arslanoglu opines that Badler's report was inconsistent with the evidence and that his methods were unscientific.[10] Pls.' Mot. Preclude Arslanoglu Exs. N, Q.

"[A] rebuttal expert must only respond to the opposing party's offered construction and the provided basis for that construction. Responding experts cannot oppose a construction by simply offering one of their own." *Shire LLC v. Amneal Pharm., LLC*, No. 11-3781, 2013 WL 1932927, at *9 (D.N.J. May 7, 2013). Therefore, Dr. Arslanoglu's appropriate testimony as a rebuttal expert is limited to responding to Dr. Badler's conclusions as to causation. Because Dr. Badler's conclusions have been excluded as speculative and unreliable, Dr. Arslanoglu's rebuttal is no longer relevant and will not assist the jury in determining whether Mrs. Stagnaro's fall was caused by Target. *See supra* Section IV(A)(1).

For the foregoing reasons, plaintiffs' motion seeking to preclude the testimony of Dr. Arslanoglu is granted.

    2.    <u>Lawrence C. Dinoff</u>

Mr. Dinoff is a licensed architect in Pennsylvania and nationally certified as an architect by the National Counsel of Architectural Registration Boards. He also holds a Bachelor's Degree in Mechanical Engineering from Rennesselaer Polytechnic Institute and a second

---

[10] Dr. Arslanoglu produced two expert reports in connection with this case, an initial report dated August 14, 2017 and a supplemental report dated March 20, 2018. Pls.' Mot. Preclude Arslanoglu Exs. N, Q.

Bachelor's Degree in Architecture from the Pratt Institute.  Mr. Dinoff's testimony is offered to rebut both of plaintiffs' experts Mr. Stoyack and Dr. Badler.

As discussed above, based on the Court's ruling excluding Dr. Badler's causation testimony, Mr. Dinoff's conclusions with respect to Dr. Badler's testimony are excluded as irrelevant.

Mr. Dinoff's expert reports also rebut Mr. Stoyack's conclusions related to industry standard and interpretation of the International Building Code and the National Safety Council data sheet.[11]  Specifically, in his initial and supplemental reports, Mr. Dinoff offers his opinion that defendant complied with applicable building codes and industry standards.  Pls.' Mot. Preclude Dinoff 4.  Although plaintiffs challenge Mr. Dinoff's conclusion with respect to that matter, they "concede that the opinion passes the Rule 702 admissibility standard."  *Id.*  at 4, 6. The Court disagrees.

Mr. Dinoff's opinions fail to meet Rule 702's "fit" requirement because they are not relevant to any material fact in the determination of this case.  In this Memorandum, for the reasons discussed *infra* in Section IV(C), the Court concludes that defendant's motion for summary judgment must be granted due to a lack of causation evidence.  Specifically, plaintiffs fail to provide any admissible evidence linking the alleged dangerous condition – the proximity of the rack to the structural pole – to how Mrs. Stagnaro fell.  Because the Court has concluded that there is insufficient evidence of causation to sustain plaintiffs' negligence claim, no material questions of fact remain.  As a result, Mr. Dinoff's opinions are not relevant to the determination of this case which is based on plaintiffs' failure to provide evidence of causation.  Consequently, Mr. Dinoff's opinions do not meet Rule 702's "fit" requirement.

---

[11] Mr. Dinoff produces three expert reports in connection with this case, an initial report dated July 13, 2017 and two supplemental reports dated August 4, 2017 and March 20, 2018, respectively.  Pls.' Mot. Preclude Dinoff Exs.I, M, Q.

For the foregoing reasons, that part of defendant's motion seeking to preclude the testimony of Mr. Dinoff is granted.

## C.  Defendant's Motion for Summary Judgment

With these evidentiary rulings in mind, the Court must now evaluate defendant's motion for summary judgment.

In this case plaintiffs assert a negligence claim based on premises liability and a loss of consortium claim arising out of the underlying negligence claim.  Under Pennsylvania law, to succeed on a negligence claim, "a plaintiff must demonstrate: (1) the existence of a duty or obligation recognized by law; (2) a breach of the duty; (3) a causal connection between the breach of duty and the resulting injury; and (4) actual loss or damage."  *Daniel v. Sears and Sears Roebucks & Co.*, No. 15-4821, 2016 WL 521205, at *2 (E.D. Pa. Feb. 10, 2016) (citing *Krentz v. Consol. Rail Corp.*, 910 A.2d 20, 27–28 (Pa. 2006)).  "The mere occurrence of an accident does not establish negligent conduct."  *Id.*

The parties do not dispute Mrs. Stagnaro's injuries, or that they were caused by her fall at the Malvern Target store.  Additionally, the parties agree that plaintiffs were invitees in defendant's store.  Under Pennsylvania law, possessors of a premises "owe a duty to protect invitees from foreseeable harm;" that is, possessors owe a duty when the possessor "knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitee."  *Craig v. Franklin Mills Assocs., L.P.*, 555 F. Supp. 2d 547, 549 (E.D. Pa. 2008) (internal quotations omitted).

In this case, to succeed on their negligence claim, plaintiffs must show that (1) Target breached a duty through the creation of a dangerous condition, and (2) the alleged dangerous condition caused Mrs. Stagnaro to fall.[12]

Plaintiffs argue that Target breached its duty to plaintiffs by creating a dangerous condition when it placed a moveable clothing rack less than 30 inches away from a structural pole in their Malvern store. To recover under this theory, plaintiffs must establish that such conduct by Target created a dangerous condition and that Target knew or should have known of the condition.[13] *Id.* at *3 (citing *Zito v. Merit Outlet Stores*, 647 A.2d 573, 575 (Pa. Super. Ct. 1994)). Notably, a standard clothing rack, in and of itself, does not constitute a dangerous condition. *See Carter-Butler v. Target Store #2596*, No. 15-04030, 2016 WL 8716338, at *4 (E.D. Pa. Feb. 19, 2016) (holding that there is no duty "to protect customers from tripping over perfectly operational clothing racks that are in plain sight.").

In this case, the Court does not address whether plaintiffs have met their burden of establishing a dangerous condition because it concludes that there is insufficient evidence of causation for plaintiffs' claims to be presented to a jury. Accordingly, the Court turns to an analysis of the causation issue.

"With respect to dangerous conditions under Pennsylvania law, a landowner can only be

---

[12] Plaintiffs' surreply argues that defendants admitted a series of facts through a failure to respond to plaintiffs' counterstatement of material facts. Pls. Surreply 1-2. Plaintiffs assert that such a response is "required" by the Court's Policies and Procedures. *Id.* The Court disagrees. The Court's Policies and Procedures state "All material facts *set forth in the moving party's statement* will be deemed to be admitted *unless controverted in the opposing party's statement." See* Judge DuBois Pretrial and Trial Procedures, General Motion Practice ¶ 5 (emphasis added). In this instance, after providing an initial statement of material facts, the moving party did not respond to plaintiffs' counterstatement of material facts, a situation not described in the Court's policies and procedures. Therefore, the Court rejects plaintiffs' argument that it must deem the facts posited by plaintiffs to be admitted.

[13] To show that the possessor of the premise knew or, through reasonable care, should have known of the harmful condition, the invitee must present evidence that the possessor "had a hand in creating the harmful condition," had actual notice, or had constructive notice of the harmful condition. *Estate of Swift v. Ne. Hosp. of Phila.*, 690 A.2d 719, 722 (Pa. Super. Ct. 1997). Plaintiff argues that the condition was created by Target employees who placed the rack in its position just before the store opened. Neither party argues that the rack might have been moved by a third party before Mrs. Stagnaro fell.

subject to liability for physical harm if the harm is caused by the landowner's negligence concerning that condition." *Butts v. Weisz*, No. 07-1657, 2010 WL 703238, at *5 (W.D. Pa. Feb. 25, 2010), aff'd, 410 F. App'x 470 (3d Cir. 2010). "Negligent conduct is said to be a legal cause if it is a substantial factor in bringing about the injury." *Id.* "Where the relevant facts show either that the defendant was not responsible for the injury, or that the causal connection between the defendant's negligence and the plaintiff's injury is remote, the question of causation is decided by the court as a matter of law." *Newton v. Norfolk S. Corp.*, No. 05-01465, 2008 WL 55997, at *4 (W.D. Pa. Jan. 3, 2008).

A court may not submit the issue of causation to the jury "if it would require guessing or speculation to determine cause." *Id.* at 5 (citing *Smith v. Bell Tel. Co. of Pa.*, 397 Pa. 134, 153 A.2d 477, 479 (Pa. 1959)). "We have said many times that the jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but that there must be evidence upon which logically its conclusion may be based." *Id.*

In keeping with these principles, courts have consistently granted summary judgment where plaintiffs provided insufficient evidence of factual causation for a jury to reach a verdict without guesswork. *See Butts v. Weisz*, 410 F. App'x 470, 472 (3d Cir. 2010) (holding that the district court properly granted summary judgment for a lack of causation evidence after precluding speculative expert testimony. "[T]he inference that [plaintiff] fell because there were dim lighting conditions and an allegedly dangerous single step was not an appropriate inference that the jury could draw or should have been given the opportunity to draw"); *Newton*, 2008 WL 55997, at *6 (finding insufficient evidence of causation where there was no evidence presented "that would prevent the jury from making a guess as to where [plaintiff's] feet were when he fell"); *see also Cuthbert v. City of Philadelphia*, 417 Pa. 610, 209 A.2d 262-63 (Pa. 1965)

(finding insufficient evidence of factual causation where a plaintiff who tripped over a trolley rail could not identify the exact portion of the crosswalk she was on when she fell or where her feet were located at the time of her fall. "[Plaintiff] may very well have fallen into the defect as she alleged, but she has failed to prove any facts upon which a jury would have been justified in so finding. It is equally possible that she tripped over a properly maintained section of the trolley rail for which, while unfortunate, no liability would have attached."); *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996).

In the present case, the Stagnaros' deposition testimony highlights the fact that plaintiffs do not know how Mrs. Stagnaro fell. Mrs. Stagnaro testified that she did not see anything unsafe near the rack as she walked towards it. C. Stagnaro Dep. 44–45. She did not see anything on the floor as she approached. *Id.* As she was walking around the rack she felt like her right foot was trapped and she couldn't lift it. *Id.* 55–56. She fell on her right side. *Id.* She testified that she doesn't know how she fell, but that she believed she stepped on something on the floor which prevented her from lifting her foot. *Id.* 59-60. She also stated that she did not trip on the pole or the legs of the rack. She claims that she knew she didn't trip on the rack because she would have felt the metal. *Id.* Mr. Stagnaro testified that he removed a Minion swimsuit that was tangled around his wife's foot after she had fallen. D. Stagnaro Dep. 20:6–13. The incident report filled out by Target employees on the day of the fall states that the accident occurred when Mrs. Stagnaro tripped on a Minion swimsuit. Def.'s Mot. Preclude Badler Ex. B. This evidence conflicts with plaintiffs' expert testimony and does not support the theory articulated in plaintiffs' response to defendant's motion for summary judgment that Mrs. Stagnaro fell when her foot became trapped underneath the rack itself due to the proximity of the rack to the structural pole.

Furthermore, none of plaintiffs' causation evidence connects the alleged proximity of the rack to the pole with the way in which Mrs. Stagnaro fell. The Stagnaros did not testify that Mrs. Stagnaro tripped on the structural pole itself or ran into the rack or pole because there was inadequate space for her to move between the two. To the contrary, the only evidence that links the fall to the proximity of the pole to the rack is found in plaintiffs excluded expert opinions. Plaintiffs' experts, Dr. Badler and Mr. Stoyack, assert that Mrs. Stagnaro was forced to sidle past the structural pole because of its proximity to the rack, and then, after moving in even closer to the rack to peruse the merchandise, tripped when her foot was caught under the support pole of the rack. They opine that Mrs. Stagnaro's fall was caused by her inability to see the floor below the rack as she edged her way past the structural pole. The Court concluded that Dr. Badler and Mr. Stoyack's theory of causation is unduly speculative, not based on the facts, and is, therefore, inadmissible. *See supra* Section IV(A)(1). In ruling on a motion for summary judgment, the Court may only rely on admissible evidence. *See, e.g., Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999). In short, plaintiffs have produced no admissible evidence connecting the alleged dangerous condition to Mrs. Stagnaro's fall.

"[I]t is not necessary that plaintiff prove with mathematical exactness that the accident could only have been caused in one manner to the exclusion of all other possibilities, but he must eliminate those other causes, if any, as were fairly suggested by the evidence" *Butts*, 410 F. App'x at 472 (citing *Cuthbert v. City of Philadelphia*, 209 A.2d 261, 263–64 (1965)). Here, plaintiffs have not eliminated other causes that were fairly suggested by the evidence. For instance, on the present record the evidence suggests that Mrs. Stagnaro tripped on a swimsuit that was hanging on the rack, had fallen to the floor, or was knocked onto the floor as she walked past. And there is no evidence that connects these possible causes to the proximity of the rack to

the pole.

"[A] mere possibility of causation is not enough. . . ." *Fedorczyk,* 82 F.3d at 75 (citations omitted).  In short, plaintiffs presented no admissible evidence in support of their claim that the proximity of the rack caused Mrs. Stagnaro's fall.  This lack of causation evidence is also decisive for Mr. Stagnaro's loss of consortium claim because his claim is derivative of Mrs. Stagnaro's negligence claim.

The Court thus grants Defendant's Motion for Summary Judgment.

## V.     CONCLUSION

For the foregoing reasons, (1) defendant's motion to preclude the testimony of Dr. Badler is granted, (2) defendant's motion to preclude the testimony of Mr. Stoyack is granted, (3) plaintiffs' motion to preclude the testimony of Dr. Ruhi Arslanoglu is granted, (4) plaintiffs' motion to preclude the testimony of Mr. Dinoff is granted, and (5) defendant's Motion for Summary Judgment is granted.

An appropriate Order follows.